The People of the State of Illinois ex rel. Frank R. Hargrove, Plaintiff in Error, v. Helen Hargrove Slive and Mary Alumbaugh, Defendants in Error.

Gen. No. 8,206.

filed July 2, 1928.

GRAHAM & DYSERT, for plaintiff in error.

ROBERT R. BOOKWALTER and W. J. BOOKWALTER, for defendants in error.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This proceeding is brought to recover the possession and custody of Marion Rutledge Hargrove, a son of relator and Helen Hargrove Slive, eight years of age, now living with his mother. Relator and Helen Hargrove Slive, then Helen Hargrove, were married in the State of Montana on April 17, 1919, while both of said parties were living in said State. The child, Marion Rutledge Hargrove, was born on February 4, 1920, while his parents were living on a ranch in Montana. The parents continued to live together as husband and wife on said ranch until December 1, 1921, when, upon relator returning to his home it is claimed that he found his wife Helen Hargrove, in the act of committing adultery in his home with one Robert Day (alias McNary), recently employed farm hand, who had come from the penitentiary at Deer Lodge, Montana. Relator testified that his wife admitted having committed adultery with other men, whereupon all of the parties—relator, the said wife, Day, the father of relator—on the next morning repaired to the Salesville State Bank near their home, and in the presence of Frank Stone, vice president of the bank, Day and Helen Hargrove confessed their wrong and signed the following statement and agreement:

"Salesville, Montana, December 2nd, 1921.

"This agreement is entered into the above day and

date by and between Frank R. Hargrove, Helen Hargrove and Robert Day.

"WITNESSETH:

"That Helen Hargrove hereby agrees to release all claim to the baby, Rutledge Marion Hargrove, and also all claim, interest and title to any property, Real, Personal, or otherwise standing in the name of Frank R. Hargrove, and further agrees to ask for no alimony, or other consideration from said Frank R. Hargrove. This agreement is also an acknowledgement that the said Helen Hargrove and Robert Day, were found by Frank Hargrove while having sexual intercourse, on the first day of December, 1921. It is further agreed that Frank R. Hargrove shall ask for no further consideration, than above stated and shall bring no criminal action against the said Robert Day.

Mrs. Helen Hargrove,<br>Robert Day,<br>Frank R. Hargrove.

R. Hargrove,
F. L. Stone.—Witness.''

At this time relator and the said defendant in error separated, but some time before April 3, 1922, defendant in error returned to the ranch and she testifies that the marital relation was resumed, while relator testifies that she returned and they lived in the same house but that the marital relation was not resumed. However, on April 3, 1922, there followed a final separation and the parties entered into a written agreement, in said State of Montana, as follows:

"Agreement of Separation Between Husband and Wife.

"This agreement, made and entered into this 3rd day of April, A. D. 1922, by and between Frank R. Hargrove, of Gallatin County, Montana, the party of the first part, and Helen Hargrove (wife of said first

party), of the same place, the party of the second part, WITNESSETH:

"That, whereas, although the said first party has urged the said second party to remain in his home and continue the married relations existing heretofore between the parties hereto, and especially for the sake of their minor son Rutledge Hargrove, age 2 years, the said second party has decided and announced the marriage relations between her and the said first party entirely and absolutely unreasonable and intolerable to her; and

"Whereas, a divorce action started by the said second party against the said first party on the grounds of extreme cruelty, in the District Court of the Ninth Judicial District of the State of Montana, in and for the County of Gallatin was dismissed, on January 11th, 1922, with a hope that said parties might be able to live together as husband and wife; and

"Whereas, said parties have come to a realization that said second party can never live happily or have any peace of mind with the said first party as his wife;

"Whereas, the. estrangement between said parties has become so great as to defeat the proper and legitimate objects of the marriage relations between the parties, and rendered such relations wholly and entirely unreasonable and intolerable to both parties;

"Now, therefore, without any intent or view of securing a divorce upon the part of either of said parties, they have agreed upon and do hereby agree to an immediate and permanent separation, upon the following terms and conditions:

"That for and in consideration of the foregoing premises, and the sum of One Hundred and Fifty Dollars ($150.00), paid by the said first party to the said second party, upon the signing and delivery of this agreement between the parties, the receipt of which payment is hereby acknowledged by the said second

party, the said parties mutually agree to an immediate, absolute and permanent separation between them as husband and wife, and that for the rest of natural life they will live separate and apart from each other; and that they do hereby, so far as law and public policy permits them to do so, renounce and surrender each to the other all and every of their respective marriage rights.

"That it is mutually understood and agreed that the said second party shall have the immediate care and custody of their said minor son, Rutledge Hargrove until said child shall attain the age of four years, which will be on February 4th, 1924, and that upon said last mentioned date, said first party shall have the full care and custody of said son for a like period of two years from and after February 4th, 1924; and that the care and custody of said son, Rutledge Hargrove, may be alternated, each party having his care and custody for periods of two years at a time, until said child attains such age as to choose between the parties hereto with whom he shall live permanently and his wishes shall rule in such matter. And that it is mutually agreed and understood by and between the parties hereto that either party having the care and custody of said son must furnish him with proper and wholesome surroundings and good influences; and that either party hereto shall have the right and privilege to see and visit said son at any and all reasonable times even when he is in the care of the other party. And that said first party agrees and promises to furnish said son with any and all necessary clothing even when in the care and custody of the said second party, and to pay for his schooling when he arrives at school age.

"That said second party hereby releases said first party from any liability for any and all of her debts hereafter contracted, and releases and waives any and all possible claims she might have now or at any time

in the future for alimony, attorneys' fees or costs in case any action may, at any time in the future be started by either of said party for a divorce; and said second party also hereby waives and releases any and all property rights, interests and claims she may have now or might have in the future in and to all property both real and personal, that the said first party may now own, or which he may hereafter acquire, in any manner.

"That, at any time, when either of the parties hereto may have the care and custody of said minor son, if the other party finds that said child is not being properly treated and cared for, or that he has been placed and is being kept in improper environment, or surroundings, the party not having the care and custody of said child may demand possession of him and take him from the care and custody in which he may then be; and, if either party hereto proves unworthy or unfit for the care and custody of said child, the other party shall have full and entire control and custody of the said son from then on.

"In witness whereof, the said parties have hereunto set their hands and seals, at Bozeman, Montana, this 3rd day of April, A. D. 1922.

Frank R. Hargrove, (SEAL)
Helen Hargrove, (SEAL)

State of Montana,
County of Gallatin.—ss.

"On this 3rd day of April, in the year One Thousand Nine Hundred and Twenty-Two, before me, M. R. Wilson, a Notary Public for the State of Montana, personally appeared Frank R. Hargrove and Helen Hargrove, known to me to be the persons whose names are subscribed to the within the foregoing instrument and acknowledged to me that they executed the same.

"IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal, the day and year last above written.

M. B. WILSON,
Notary Public for the State of Montana,
(SEAL)    Residing at Bozeman, Montana.
My commission expires April 22, 1922."

The testimony of defendant in error, Helen Hargrove Slive, shows that on April 4th, the next day after she signed the contract, she went to Bozeman and consulted a lawyer, M. R. Wilson, who advised her: "Before Frank changes his mind and makes you stay in Montana with this baby you take this opportunity and go your sister's where you have a home." She states that on April 7, 1922, she was in Danville, this State.

Defendant in error further testified: "I took the child out of the State (Montana); that is what Mr. Wilson told me to do—the best thing—before Mr. Hargrove compelled me to stay in Montana with him. Wilson drew the contract between both of us; it was agreed between us that we should separate in that way. He was my lawyer that tried to get my divorce; have kept the child back here will be six years this coming April. I intend to keep it all the rest of the time. I knew at the end of two years I should turn the child back to his father, but he never supported him the first two years I had him and why should I turn him over. I never wanted him to have the boy. I went to see Judge Graham as quick as I came back here before the end of two years. I went to see if the father could come and get him."

Relator testifies that the child was taken from Montana clandestinely and for years he did not know where he was; that he made a trip to the State of Oregon searching for the child and that since hearing that the child was in Danville he has forwarded clothes and presents. The record is bare as to any divorce

proceedings between the parties, but it is evident that they are divorced and have both remarried. Relator remarried over three years ago. He has a wife who is willing and anxious to make a home for the child. They live in a considerable sized town in a western state very near to a large and efficient school. Relator is the owner and operator of a ranch, has a large stock and for the state and times is in affluent circumstances. Relator also has a son by his second wife who is now about two years of age. Defendant in error Helen Hargrove Slive has also remarried and has two children by the second marriage. Her husband is a coal miner at Georgetown in Vermilion county, and the testimony is that he supports his family in a comfortable way.

There was testimony tending to show that defendant in error Mary Alumbaugh, sister of Mrs. Slive, where the child was found and with whom it had lived at various times, was a boisterous woman, using foul language and not a fit person to have the custody or companionship of the child. Relator testified that when he went to her home with another party to see the child, she said, ''To hell with deputy sheriffs,'' and that when the child commenced to cry she said, ''Shut up, you little son of a bitch.'' These statements she denies but it is apparent that a portion of her neighbors gave her a wide berth. One, Fred Short, living in Georgetown, 27 years of age, knew both of the defendants in error and had seen Helen Slive ''down town with many women and with a woman whom I caught in bed with another man; saw her running around with this woman on the streets once or twice.'' He testified that he did not know Helen Slive's reputation for chastity but for some reason the court refused to permit the witness to state if he knew the reputation of the other woman for chastity. Defendant in error Helen Hargrove Slive denied that she ever committed adultery with Day or with any

other person, and explains that she signed the agreements because relator had a gun and compelled her to sign the instruments. Her testimony in that respect does not impress this court as it did not impress the circuit court of Vermilion county. That court, after hearing all of the testimony, in a statement of record found all of the substantial facts in the case as follows:

"OPINION AND JUDGMENT OF THE COURT

"This is a hard proposition, it is just about as hard to do right between these parties as anything I have ever tried to do. I am inclined to think that both of these parties are vitally interested in the welfare of this child. Whatever else may be true, I don't think their interest in this child can be questioned, either one of them. I think the mother loves the child and would do anything on earth she could for his welfare. And I think the father would do the same thing. Don't either one impress me as being bad people. I believe in the main the father has been honest. He had a very frank way of expressing himself and he has been asked a good many questions a man disposed to lie would deny them, he told you of the facts very frankly. That meant a good deal to this court. I don't know anything about their trouble, I am not deciding the merits of that in this controversy at all. If these parties both lived here where they could continue in the jurisdiction of this court it wouldn't be very hard to decide this question.

"They decided the question perhaps as fairly as it ever could have been decided that one time. They would both have been better off if they kept their contract. But that does not help this situation any. If I could send the boy with the father, the mother has had him for a long while, if I could send him with the father and bring him back here when the time is up, I would be glad to do it. I think the father is entitled to the custody of this child for a while. I

think he would take care of him, and is entitled to get acquainted with his own child. Of course, his child don't want to live with him now, don't know anything about him, never had a chance to know anything about him, was small when he left him. And, of course, on the other hand the mother has had the custody of the child, the child knows her, she is attached to it. The child undoubtedly has a good home now, they are doing well by him, he is getting a father's attention, no doubt about that. Anybody can tell by looking at the child he is not neglected. Mr. Hargrove, if I send this boy out to you next summer, would you let him come back here during the school time?

"Mr. Hargrove. I will do that, if you make the arrangements, but I would rather take him there and send him to school there.

"The Court. Mrs. Hargrove, would you be willing for the boy to go to his father during the summer time and then come back here for school, let's see that would be—when does school let out?

"Mrs. Alumbaugh. It lets out about the 8th or 10th of June.

"The Court. Say about the 10th of June and then come back here when school starts and spend the school term with you. When does school start?

"Mrs. Alumbaugh. About the 7th of September.

"The Court. That would be about three months, would you be willing for that to be done, Mrs. Hargrove?

"Mrs. Hargrove. I don't know, I don't know that he would bring him back. He would get him out there and keep him.

"The Court. Mr. Hargrove, will you be willing to promise this court that you will bring the child back here to his mother if I turn him over to you during the summer?

"Mr. Hargrove. It would be pretty expensive on me and also in September is when I am awfully busy

getting my hay and in June I am awfully busy getting in a crop. I don't see how I could spare the time at that time of the year to come all the way out here and also the expense. I would rather have him with me all the time. I don't see how I can do it.

"THE COURT. All right, if that is the way you feel. Custody of the child awarded to the mother until the further order of this court."

To which ruling and judgment relator excepted and has brought the record to this court by writ of error, for review.

We have examined the testimony and are satisfied with the finding of the court that each of the parents have great love and affection for the child and would do anything for it and are vitally interested in its welfare, and are fit and proper persons to have the care and custody of the child. We are further in accord with the court's finding that the contract between the parties, as set out, was fairly made and as fair and just a settlement between husband and wife as could have been made at the time the contract was entered into. We are further in accord with the finding of the court that the father is entitled to the custody of the child for a season, under the terms of the contract; that he would take care of him and that the father is entitled to get acquainted with his own child. The further finding of the court: "Of course, his child don't want to live with him now, don't know anything about him, never had a chance to know anything about him, was small when he left him," is not a finding of anything bearing upon the best interests of the child, and the finding of the court that the boy is now getting a father's care is not in any respect supported by the proofs. The roof under which the child lives will naturally be given for Slive's children. The real holding of the circuit court of Vermilion county is that the contract entered into in Montana, between relator and defendant in error, was fair, equitable and

for the best interest of the child and should be carried out. There is no finding, under the proofs, that it is not for the best interest of the child to carry out the terms of the contract, unless the immediate, childish impulses of Marion Rutledge Hargrove, now eight years of age, are to dictate what is for his best good.

The writ of "Habeas Corpus is a legal and not an equitable remedy. This is true even when the writ is used to determine the custody of infants, although in such cases it has been held to be an equitable remedy, and a court of equity in exercising its jurisdiction over infants may issue and use the writ as ancillary process." 29 C. Juris, 9.

A court of equity has original jurisdiction to determine the custody of a child where no other questions are involved. *Cowls v. Cowls,* 3 Gilm. (8 Ill.) 435; *People ex rel. Crofts v. Wait,* 243 Ill. App. 367, 372, and equity may afford a more equitable remedy. *People ex rel. Crofts v. Wait, supra.*

In the case at bar many questions are raised which are the same as the questions raised in *People ex rel. Crofts v. Wait, supra,* and in that case the court held:

"While in the instant case the primary question is, Is it for the best interests of the child that his custody be given to the mother? Yet, obviously this is not the sole question, but the court on the hearing should take into consideration the fact that the Ohio court granted the father of the child the divorce on account of the fault of the mother and gave him the custody of the child for 10 months of each calendar year, granting the mother the right to have the child for two months of each year upon a proper showing; and that the father has taken care of the child since the child was about two years old. These and other matters as may be disclosed by the evidence will be important in determining whether the custody of the child should be changed."

Under the laws of this State the parents of a minor child have equal powers, rights and duties concerning the minor. Section 4, chapter 64, Revised Statutes, Cahill's St. ch. 64, ¶ 4. Subject to this statute, it has been held that the father is entitled to the custody, care, control and education of his son. "He is its father and has the natural right to have such custody. * * * As father of the child he has the right to its custody as against the world, because there is no showing that he has forfeited such natural right. *Sullivan v. People,* 224 Ill. 468; *Cormack v. Marshall,* 211 id. 519; *People v. Turner,* 55 id. 280." *Stafford v. Stafford,* 299 Ill. 438, 448.

Some testimony was introduced on the trial of the cause by defendant in error Helen Hargrove Slive tending to impeach the validity of the contract entered into between the parties in Montana, on April 3, 1922. This was a solemn contract, under seal, importing a good and valid consideration both in a financial way and touching the best interests of the minor child. The parties have since been divorced, and the integrity of this contract not interfered with. We must conclude, nothing to the contrary being shown, that either the decree ratified the provisions of the contract, or that by common consent its admissions and solemn provisions were to remain binding upon the parties. In any event, this being a suit at law, the integrity of the contract cannot be impeached in this suit. *Knobloch v. Mueller,* 123 Ill. 554, 566; *Krieger v. Krieger,* 221 Ill. 479, 485; *Hohenadel v. Steele,* 237 Ill. 229, 234.

The effect of the contract is that defendant in error Helen Hargrove Slive surrendered in part her parental right to the custody of the child to conform to the terms of said contract. *Hohenadel v. Steele, supra.* The situs of this marriage, contract and divorce was in the State of Montana. Defendant in error Helen Hargrove Slive, to defeat the terms of the contract,

surreptitiously removed the child to the State of Illinois, and under all the proofs is entitled to no equities in the subject matter, which are not strictly in conformity with the contract. While relator, by the terms of the contract, could not absolve himself from his parental duties, and is held by defendants in error liable to the support of the child, he is also entitled to his natural rights, and, so far as defendants in error are concerned, to the custody of the child in accordance with the terms of the contract. It only remains to consider the best interests of the child. The judgment in the case at bar finds that relator has no rights of any kind to the minor, Marion Rutledge Hargrove. This was error. The substance of the finding of the court is that relator is a fit and proper person to have the custody of the child and that it is for the best interests of the child that the terms of the contract be carried out, except that the schooling of the child should not be interfered with during the school year. The custody of the child is then awarded to defendant in error, the mother. This was error. The award evidently grew out of a colloquy between the court and relator, as recited. Relator, after stating that he would follow arrangements suggested by the court, merely suggested the burden that certain suggestions would impose upon him, which seemed unreasonable, and the court thereupon entered judgment denying all the relator's rights. This was error. Relator has the same rights in the courts of Illinois as any other citizen, regardless of his residence in the State of Montana, and should not be subjected to any unreasonable burdens. *People ex rel. Schutt v. Siems,* 198 Ill. App. 342; *Stafford v. Stafford,* 299 Ill. 438, 451.

Objection is made by defendant in error, the mother, to the removal of the child from the State of Illinois and the jurisdiction of its courts. In a proper case, in accordance with the rule laid down in *Miner v. Miner,* 11 Ill. 43, and *Alford v. Bennett,* 279 Ill. 375,

the objection could be properly urged, but the rule does not apply to the facts in this case. Under the terms of the contract, the residence of the minor, Marion Rutledge Hargrove, is in the State of Montana where he was born, in so far as all rights of the relator is concerned, and there is no more ground for invoking the rule in this case than there was in *Stafford v. Stafford, supra.* Especially is this true inasmuch as the defendant in error illegally and surreptitiously attempted to change the residence of said child by bringing it into the State of Illinois. Any order entered in that behalf should be an order providing that security be given for the carrying out of the contract. It should apply to both parties alike and should be reasonable and within their respective abilities to perform, and not result in hardship. No order should be entered that effects a change in the custody of the child prior to the expiration of the school year in June, 1928. As to the wish of the minor, the rule should be followed in this case the same as in *Stafford v. Stafford, supra,* where the court said:

"In a very doubtful case the wish of the child is to be considered and given weight, but we do not think that the wish of the child in this case should have any great weight in determining the question of custody."

The judgment of the circuit court of Vermilion county is therefore reversed and the cause remanded with directions to enter a judgment, granting the prayer of relator's petition in accordance with the views expressed in this opinion.

*Reversed and remanded with directions.*